PHILLIPS, Circuit Judge,
dissenting:
Although I agree with the majority that the district court abused its discretion in selecting June 25, 2013 as the trigger date for sanctions, I would go further and conclude that the district court abused its discretion in awarding any sanctions at all. I respectfully dissent.
In evaluating the district court’s sanctions directing plaintiffs’ attorneys to pay the attorneys’ fees incurred by the Mayor (the City)[1], a good starting place is the language of 28 U.S.C. § 1927 itself:
Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys’ fees reasonably incurred because of such conduct.
We have cautioned that the power to impose sanctions under this section must be strictly construed and used only when attorneys show a “serious and standard [sic] disregard for the orderly process of justice.” Braley v. Campbell, 832 F.2d 1504, 1512 (10th Cir.1987) (en banc) (quoting Dreiling v. Peugeot Motors of Am., Inc., 768 F.2d 1159, 1165 (10th Cir.1985)). Along this line, we have “recognize[d] the importance of ensuring that § 1927 ‘in no way will dampen the legitimate zeal of an *1280 attorney in representing his client.’ ” Braley, 832 F.2d at 1512 (quoting H.R.Rep. No. 96-1234, at 8 (1996) (Conf.Rep.)). “Sanctions under § 1927 are appropriate when an attorney acts ‘recklessly or with indifference to the law.’ ” Dominion Video Satellite, Inc. v. Echostar Satellite L.L.C., 430 F.3d 1269, 1278 (10th Cir.2005) (quoting Braley, 832 F.2d at 1511). “Sanctions are appropriate, then, when an attorney is cavalier or ‘bent on misleading the court....’” Miera v. Dairyland Ins. Co., 143 F.3d 1337, 1342 (10th Cir.1998) (quoting Herzfeld & Stern v. Blair, 769 F.2d 645, 647 (10th Cir.1985)).
Although we review a district court’s award of sanctions for an abuse of discretion, we review de novo a district court’s legal determinations underlying the exercise of that discretion. Hamilton v. Boise Cascade Express, 519 F.3d 1197, 1202 (10th Cir.2008) (citations omitted). Under this standard, I conclude that the district court abused its discretion in awarding any sanctions against plaintiffs’ attorneys. In explaining why, I separate the case’s history into discrete time periods and analyze each.

1. January 17, 2013, to June 25, 2013

On January 17, 2013, the plaintiffs (four Latino voters in Albuquerque) filed a voting-rights lawsuit in New Mexico state court, challenging a redistricting map that the Albuquerque city government adopted in 2012 after the 2010 Census. The complaint alleged claims for relief under both federal and state law. Specifically, it set forth claims challenging the redistricting map as “deviating] impermissibly from population equality,” in violation of the Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution and of Article VI, Section 13 of the New Mexico Constitution. Appellant’s App. vol. I at 14. The plaintiffs further alleged that the redistricting map “minimizes the opportunities of Latinos to participate in the political process and to elect the representatives of their choice,” in violation of 52 U.S.C. § 10301 (formerly cited as 42 U.S.C. § 1973; Section 2 of the Voting Rights Act of 1965, as amended), as enforced by 42 U.S.C. §§ 1983 and 1988. Appellant’s App. vol. I at 14-15. On January 24, 2013, the city removed the case to federal court. On March 25, 2013, at a pretrial conference, a federal magistrate judge set pretrial deadlines, including a discovery-cutoff on July 22, 2013.
On June 25, 2013, the City provided plaintiffs’ attorneys with the report of their expert witness, Brian Sanderoff. In addition to serving as the city’s expert witness in the lawsuit, Sanderoff had earlier managed the city’s redistricting process, which led to the submission and adoption of the challenged redistricting map. In its August 29, 2014 sanctions order, the district court commenced sanctions from June 25, 2013, contending that Sanderoffs report had established that plaintiffs’ claims were meritless. I agree with the majority that the district court erred in using that triggering date. As the majority notes, the plaintiffs needed time to study the report. Maj. Op. at 1278-79.
But under our case law, I cannot see how the plaintiffs’ attorneys had multiplied the proceedings by filing a lawsuit and being handed the opposing side’s expert report. See Steinert v. Winn Grp., Inc., 440 F.3d 1214, 1224 (10th Cir.2006) (concluding that a plaintiff does not multiply proceedings by filing a complaint, even if meritless).

2. June 26, 2018, to July 16, 2013

On July 1, 2013, the plaintiffs’ attorneys told the City’s attorneys that the plaintiffs would soon seek to voluntarily dismiss their complaint without prejudice. Despite a looming discovery-cutoff date, the parties had conducted little discovery *1281 apart from exchanging expert-witness reports. Although both parties had issued written discovery requests — each contesting the adequacy of the other’s responses-neither party had sought a motion to compel.
On July 5, 2013, true to their word, plaintiffs’ attorneys did file an “Opposed Motion to Dismiss Without Prejudice.” Appellant’s App. vol. I at 46. In this motion, the plaintiffs advised the district court that they desired to avoid interfering with the city elections and sought to “ascertain whether the change in the political landscape in the City of Albuquerque” had alleviated the need for further litigation. Id. In this regard, they “wanted to gather data from the next election in October 2013 (and possible runoff elections in November 2013) to assess whether the change in law actually addressed their concerns, or whether they would need to refile their claims at a later time.” Appellant’s Br. at 6; Appellant’s App. vol. I at 112-13.
The referenced change in the political landscape stemmed from a March 11, 2013 city-wide election at which the voters changed the City’s charter to require runoff elections when no candidate received more than 50% of the vote. Until that time, a candidate could win with anything more than 40% of the vote. The 2009 mayoral election illustrates the effect of the charter amendment. There, Mayor Berry, a white candidate, won the election with 43.82% of the vote, while two Hispanic candidates split the remaining 56% of the vote. Under the charter amendment, Mayor Berry would not have won office after the first vote, but instead a mere right to participate in a runoff election against the stronger of his two Hispanic opponents.
In view of this change, it is unsurprising that the plaintiffs’ attorneys say the charter amendment led them to “reassess[] whether they needed to pursue their lawsuit.” Appellant’s Br. at 5. In seven short weeks since filing the lawsuit, Albuquerque electoral politics had shifted dramatically. The plaintiffs felt the charter amendment could lead to a majority-Hispanic city council, which, they hoped, might “allow the Latino community to make any further necessary changes to the map through legislation rather than litigation.”[2] Appellant’s App. vol. I at 112; Appellant’s Br. at 5.
Thus, for the period up to July 16, 2013, I cannot see how the plaintiffs’ attorneys multiplied the proceedings at all, let alone unreasonably and vexatiously. I see no comparable case in which a court has found otherwise when a plaintiffs sole substantive filing was a motion to dismiss its claims without prejudice. As I read our. case law, any trigger date before the City filed its motion to dismiss — on July 17, 2013 — would be too soon. Steinert, 440 F.3d at 1225-26 (concluding that, because the sanctioned attorney did nothing with his § 1985 claims until after the opposing party moved to dismiss, “the district court abused its discretion to the extent it awarded fees based on [the opposing] counsel’s preparing the ... motion to dismiss”).
Ultimately, the district court imposed sanctions against plaintiffs’ attorneys to reimburse the City for its attorneys’ fees incurred in seeking dismissal of the suit and obtaining sanctions. In my view, this *1282 was an abuse of discretion. I note that in Roth v. Spruell, 388 Fed.Appx. 830 (10th Cir.2010) (unpublished), we concluded that the district court abused its discretion by-starting § 1927 sanctions before the defendants had filed their motion to dismiss.[3] Id. at 833, 836-37. In that regard, we relied on Steinert, 440 F.3d at 1225-26, for its conclusion that “a district court abused its discretion to the extent it awarded fees based on the preparation of defendants’ motion to dismiss.” Roth, 388 Fed.Appx. at 836. Likewise here, the award of sanctions should not have included any of the City’s attorneys’ fees incurred in preparing and filing its motion to dismiss.

3. July 17, 2013, to September 3, 2013

On July 17, 2013, the City refused the plaintiffs’ offer to dismiss without prejudice and instead filed its own motion to dismiss with prejudice under Fed.R.Civ.P. 41(b). In support, the City claimed, that the plaintiffs had failed to prosecute the case or follow court rules or orders. The .City cited five factors courts use in evaluating the appropriateness of an involuntary dismissal with prejudice: “(1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions.” Appellant’s App. vol. I at 84 (quoting Ehrenhaus v. Reynolds, 965 F.2d 916, 921 (10th Cir.1992) (internal quotations and citations omitted)). In support of its motion, the City alleged that the plaintiffs had not pursued their case or complied with discovery obligations.
Over the next seven weeks, the parties responded and replied to each other’s motions to dismiss. On September 3, 2013, the district court issued a written decision, first noting its discretion in deciding whether to dismiss with or without prejudice. In assessing whether the City would suffer “legal prejudice” from a dismissal without prejudice, the district court identified four factors: (1) the effort and expense in preparing for trial; (2) any excessive delay or lack of diligence by the movant; (3) the sufficiency of the explanation of the need for dismissal; and (4) the present stage of the litigation. See Phillips USA, Inc. v. Allflex USA, Inc., 77 F.3d 354, 358 (10th Cir.1996).
After referencing the parties’ finger-pointing about the other’s alleged discovery delays and abuses, the district court declined to declare or apportion fault, settling the matter by reminding the parties that neither one had sought judicial intervention. In addressing the City’s argument that the plaintiffs’ claims for relief lacked merit, the district court noted that the City relied on “portions of an expert report by Brian Sanderoff, which pokes holes in Plaintiffs’ allegations by demonstrating the success Hispanic candidates have had in past elections.” Appellant’s App. vol. I at 188.
At the same time, the district court also agreed that the plaintiffs needed to await the results of the upcoming election to assess whether the charter amendment had resolved their concerns: “Plaintiffs also offer a viable explanation for seeking dismissal without prejudice, claiming that they did not want this lawsuit to interfere with the upcoming city elections and point *1283 ing to a change in the law which could render moot the present concerns they have with the current redistricting.” Appellant’s App. vol. I at 188. In considering the effect of the voter-passed charter amendment, particularly in regard to May- or Berry’s 2009 electoral victory with 43.82% of the vote, the district court noted that “[i]n such a scenario, the new Charter amendment could be viewed as a remedy for the alleged constitutional deficiencies in the redistricting map.” Id. at 189.
Having weighed the city’s arguments, the district court found that “[a]t this point, the record is insufficient to warrant dismissal with prejudice.” Id. at 190. But it also found “that granting Plaintiffs’ motion to dismiss the case without prejudice is not the best recourse to take, either.” Id. So the court sua sponte imposed a stay and deferred ruling “until after the upcoming mayoral election.” Id. In doing so, the court acknowledged the correctness of the plaintiffs’ approach in monitoring the upcoming elections to see whether the charter amendment had solved their concerns. The court stated that if the election indeed showed plaintiffs that further legal action was unnecessary, the court could then dismiss the case with prejudice. And if it showed otherwise, the court said that the plaintiffs would be “free to pursue the litigation without having to re-file the case.” Id. In sum, the court found “that a stay prejudices neither [party] and benefits judicial economy.” Id. Obviously, the court assumed that the plaintiffs may well have meritorious claims, and it gave no inkling that § 1927 sanctions might even be possible.

4. September 4, 2013, to November 12, 2013

During this interval, the case sat inactive while awaiting results from the mayoral election to shed light on any further need for plaintiffs to pursue their claims. I cannot see how plaintiffs’ attorneys did anything to multiply the proceedings in these two months. Instead, I see them waiting on standby in compliance with the district court’s stay.

5. November 13, 2013, to December 17, 2013

On November 13, 2013, days after the mayoral election, the district court held a six-minute telephonic status conference with counsel for both parties. Addressing the district court’s September stay, the plaintiffs’ attorneys told the court that they had contemplated the stay would last through the following Tuesday’s runoff election in District 7, which might render moot the with-or-without-prejudice issue. Significantly, plaintiffs’ attorneys also offered to dismiss their federal claims (almost certainly with prejudice)[4] and instead proceed in state court with their state equal-protection claim. Neither the City nor the court accepted the offer. At the conclusion of the hearing, the district court continued the stay, informing counsel that it would set the case for another telephone conference in two to three weeks so that the parties could consult with their clients after evaluating the results from the District 7 election.
Here, it is important to remember that the district court’s order dismissing with prejudice did not specifically address the *1284 viability of the state-law equal-protection claim. I am unsure whether the New Mexico Supreme Court would extend the state’s equal-protection guarantee beyond what the Equal Protection Clause of the Fourteenth Amendment requires. Accordingly, I cannot see how the plaintiffs’ attorneys multiplied the proceedings — let alone unreasonably and vexatiously — by insisting only on an option to pursue then-state claims in state court. See Arias v. Cameron, 776 F.3d 1262, 1268 (11th Cir.2015) (stating that district court should grant voluntary motion for dismissal without prejudice unless “the defendant will suffer clear legal prejudice other than the mere prospect of a second lawsuit”); Davis v. USX Corp., 819 F.2d 1270, 1274 (4th Cir.1987) (“It is well established that, for purposes of Rule 41(a)(2), prejudice to the defendant does not result from the prospect of a second lawsuit.... Indeed, in cases involving the scope of state law, courts should readily approve of dismissal when a plaintiff wishes to pursue a claim in state court.” (citations omitted)).
On December 11, 2013, the district court ordered a status conference on December 17, 2013 at 11:00 a.m. But sometime before the hearing, the district court vacated it and never set another in its place.[5] Instead, on January 3, 2014, apparently out of the blue, the court issued an order dismissing the complaint with prejudice.[6] Without explaining its abrupt about-face in forgoing a status conference where plaintiffs would have reported the effect of the November elections, the court simply announced that, “[a]t this point, the Court does not see any benefit to further briefing or discussion.” Appellant’s App. vol. I at 196. In summary fashion, the court concluded that dismissal with prejudice was appropriate “because it is apparent that there is no longer a case to pursue.” Id. at 195. Suddenly, and in contrast to its own stated view in September, the court declared that the plaintiffs’ attorneys’ expressed desire to evaluate the mayoral and District 7 election results before agreeing to dismissal with prejudice “would seem to be disingenuous” when “Plaintiffs still cannot make a decision about whether they have a meritorious lawsuit or not.” Id. at 196. Although I do not understand why, the district court seemingly took offense that plaintiffs’ attorneys had not somehow themselves scheduled a status conference to replace the one the court itself had earlier set and vacated without notice. Because of their failure to do so (if it can be called that), the court concluded that they “apparently do not want to admit that there is no merit to the underlying case, and yet do not wish to pursue litigation, even though the purpose of the stay was to give Plaintiffs the time to make that exact determination.” Id. “For these reasons,” the court dismissed the complaint with prejudice. Id. Ordinarily, this would end the case. But here it didn’t.
6. January 4, 2013, to August 29, 2014
On January 17, 2014, relying in part on 28 U.S.C. § 1927, the City filed a motion seeking $106,003.51 in attorneys’ and experts fees it incurred defending the suit from start to finish.[7] The City’s motion *1285 reargued its earlier positions, including ones the district court had already passed on, such as discovery delays and abuse. Primarily, it relied on Sanderoffs report as proving that the plaintiffs’ claims never had merit. From the attached hourly-fee charts, I see that the City sought reimbursement for all its fees expended from filing of the complaint in January 2013 through its dismissal in January 2014. Briefing by the parties followed.
On May 12, 2014, the district court held a hearing on the City’s motion requesting fees and costs. The City called Sanderhoff as a witness, and the plaintiffs called one of its experts, George Korbel, and one of the named plaintiffs, Phillip Baca. On August 29, 2014, the district court entered its order granting in part and denying in part the City’s motion for attorney fees, expert fees, and costs. After reciting the case’s procedural history, the court again noted that “Plaintiffs had a good faith basis for filing a complaint; however, there came a point in the litigation when the case was no longer viable.” Appellant’s App. vol. Ill at 406-07. As what it styled its “magic date” marking lack-of-viability, the court chose June 25, 2013, the date the City provided plaintiffs with Sanderhoffs expert report.
Suddenly, in the district court’s view, the Sanderoff report became a be-all, end-all curtain-closer against the plaintiffs’ claims.[8] Nowhere did the district court mention or distinguish its earlier-stated views that the Sanderoff report had merely “poked holes” in the plaintiffs allegations by showing that Hispanics had fared well in earlier city elections. Appellant’s App. vol. II at 201. Nowhere did the district court consider the City’s failure ever to seek — let alone win — a dismissal under Fed.R.Civ.P. 12(b)(6) or Fed.R.Civ.P. 56, even when armed with the supposedly unchallengeable Sanderoff report. Cf. In re Ruben, 825 F.2d 977, 988 (6th Cir.1987) (holding that “[t]he denial of the motions for' summary judgment precludes a sanction on the ground that the claims against them were legally insufficient” and that “[a] sanction is generally improper where a successful motion could have avoided any additional legal expenses by defendants” (emphasis in original)).
I am wary of the district court’s and majority’s approach of resolving the sanctions motion as if it were a summary-judgment motion upon which the City must prevail. I agree with the plaintiffs’ attorneys that had the City really brought a summary-judgment motion, the plaintiffs could have tested Sanderoffs conclusions under cross-examination and also marshaled their own experts and evidence to oppose the motion. See, e.g., Fed.R.Civ.P. 26(e) (allowing experts to supplement their reports, requiring additions or changes to be disclosed by the time pretrial disclosures under Rule 26(a)(3) are due). Moreover, even if the City had prevailed on a dispositive motion, that hardly would automatically have qualified it for § 1927 sanctions. See Bixler v. Foster, 403 Fed.Appx. 325, 328 (10th Cir.2010) (unpublished) (“Losing is part of the lawyer’s lot, and § 1927 isn’t aimed at shifting fees from winners to lawyers who happen to represent the losing side.”).
After reaching its result, the district court declared that it “would have been inclined to grant leniency towards Plaintiffs’ counsel if they had simply acquiesced *1286 to Defendant’s request to dismiss with prejudice.” Appellant’s App. vol. Ill at 407. Presumably, the district court’s deadline for acquiescence would have come after the November 2013 elections since it had agreed that plaintiffs needed time to evaluate how the charter amendment affected those claims. Although the district court acknowledged that the December 17, 2013 status conference “did not occur due to the Court’s scheduling conflicts,” it passed right by how its vacating that hearing kept the plaintiffs from reporting to the court whether the District 7 runoff-election results had ameliorated their concerns. Id. at 195. Rather than assume the plaintiffs’ attorneys were awaiting the court to set another status conference before reporting their post-election position on their claims, the district court treated the plaintiffs’ attorneys as having dawdled away a fair chance to update the court.
Eight months later, after extensive briefing and an evidentiary hearing, the district court imposed personal sanctions against plaintiffs’ attorneys of $21,199.38 for the City’s attorneys’ fees imposed from June 25, 2013, through the dismissal on January 3, 2014, and another $27,018.57 for the City’s attorney fees seeking sanctions after dismissal with prejudice on January 3, 2014, and through the May 2014 hearing.[9]
Again, I fail to see what the plaintiffs’ attorneys did to multiply the proceedings from January 4, 2014, through June 24, 2014. First, no one alleges that the plaintiffs’ attorneys delayed those proceedings. Cf. Roth, 388 Fed.Appx. at 837 (disallowing post-judgment sanctions for opposing party’s attorney’s fees partly “because [the losing party] did not take any action to multiply the proceedings after the district court granted the motions to dismiss,” resulting in our concluding that “the district court abused its discretion by including amounts incurred after that date in its award of fees and costs”); Steinert, 440 F.3d at 1224 (allowing fees incurred after judgment on a record showing “that the parties filed numerous and extensive briefs on the fee issue, and that [the sanctioned attorney] sought at least ten extensions of time to comply with the briefing deadlines”). ■
Second, the plaintiffs’ attorneys did not multiply the proceedings by refusing to pay the City’s initial demand for $106,003.51 (all the attorney and expert fees it incurred from filing of plaintiffs’ complaint). Steinert itself would deprive the district court of any authority to award § 1927 sanctions beginning from the initiation of the complaint. See 440 F.3d at 1224-25. It is hard to miss the irony here in the City’s demand for sanctions for plaintiffs’ supposedly meritless claims when its own claim for $106,003.51 ran afoul of Steinert, one of the highest-profile cases our court has on the § 1927 issue.

7. Section 1927 with Voters-Rights Claims

Although I recognize that § 1927 applies against all claims, I would more cautiously approach the awarding of sanctions in voters-rights claims. Stipulated facts supported the district court’s conclusion that the plaintiffs had brought their complaint in good faith. Much had happened from years 2000 to 2010 with Albuquerque’s population. It had grown by about 100,000 residents, and 75% of the growth was in *1287 the Hispanic population. Despite that, the new redistricting map kept Latino-majority districts flat at three of nine districts. Certainly, the Voting Rights Act affords citizens an opportunity to litigate to ensure they receive an “equality of opportunity.” See Johnson v. De Grandy, 512 U.S. 997, 1014 n. 11, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994).
I am far from convinced that any of the plaintiffs’ claims for relief were meritless. And in particular, I question the district court’s and majority’s not separately analyzing the plaintiffs’ state-law equal-protection claim. Everyone should agree that the New Mexico Supreme Court is fully empowered to interpret its state’s equal-protection guarantee more broadly than the Supreme Court interprets the Fourteenth Amendment’s guarantee.
I fear that the unintended but lasting result of this decision will be to frighten off potential voting-rights challengers and their attorneys lest they suffer considerable sanctions[10] — even when the redistricting governmental entity lacks sufficient confidence to file a Rule 12(b)(6) or Rule 56 motion.[11] “The purpose of [§ 1927 sanctions] is to deter dilatory litigation practices and punish aggressive tactics that far exceed zealous advocacy.” Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater, 465 F.3d 642, 646 (6th Cir.2006). Section 1927’s purpose is not to deter plaintiffs from filing lawsuits. See Blue v. U.S. Dep’t of Army, 914 F.2d 525, 534-35 (4th Cir.1990) (noting that “[t]he sheer breadth and magnitude” of sanctions imposed in a Title VII case “gives us pause” because sanctions “may chill meritorious as well as meritless claims and dissuade deserving parties from ever bringing suit for fear of the concomitant burden of sanctions”). I am unpersuaded by the City’s argument that the plaintiffs filed the complaint as a publicity stunt to rile local Hispanic voters. In my view, the Hispanic community would likely view the plaintiffs’ voluntarily dismissing their own lawsuit much more favorably than it would the City’s convincing the district court to dismiss it involuntarily over the plaintiffs’ objection.

8. Conclusion

For these reasons, I conclude that the district court abused its discretion in imposing any sanctions against the plaintiffs’ attorneys and would reverse the order granting sanctions and remand the case for the district court to vacate its order imposing sanctions. Accordingly, I respectfully dissent.

. The plaintiffs sued Mayor Richard J. Berry in his official capacity. See Hafer v. Melo, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) (stating that suits against officials in their official capacity should be treated as suits against the governmental entity).

. Indeed, things changed. The newly constituted city council resolved on February 14, 2014, to oppose the City's instant effort to seek sanctions. In explaining its reasoning, the council declared that the “very nature of the dispute in Baca v. Berry related to participation in the political process, and thus [the mayor’s argument] that the suit was politically motivated is not a credible basis for frivolity[.]” Appellant's App. vol. II at 292.

. In fact, in Roth the district court did not begin the sanctions until five months after the motion to dismiss. It was then that the defendants provided plaintiffs' attorneys a citation to a Tenth Circuit case defeating their claim for relief. We noted that ''[biased on Steinert, the district court presumably could have started the clock for fees from the date of the filing of the motion to dismiss; instead, the district court used the date that [plaintiffs’ attorney] was notified of the [adverse] decision....” 388 Fed.Appx. at 836.

. The majority expresses uncertainty whether the offer to dismiss was with prejudice. Maj. Op. at 1272 n. 7. Although the district court’s language was not precise on this point, I believe it points toward the offer's having been to dismiss the federal claims with prejudice. The district court restated the plaintiffs' attorneys' argument as having “offered to dismiss the case without prejudice or dismiss the federal claims and allow the case to go back to state court....” Appellant's App. vol. Ill at 410. The plaintiffs’ attorneys characterize their offer as “to proceed on only their state claims in state court....” Appellant’s Br. at 28.

.In the order dismissing with prejudice, the district court said that it had vacated the December 17 hearing because the court's criminal proceedings that day went longer than expected. The court did not say why it never rescheduled another hearing to replace the one it vacated before dismissing the case with prejudice.

. The district court denied the city’s earlier request to dismiss with prejudice as a sanction under Fed.R.Civ.P. 16(f) and Fed.R.Civ.P. 37(d).

. By the time of the May 2014 hearing on sanctions, the City claimed more than $134,000 in attorneys’ fees. Most of these fees resulted from the City’s motion to dismiss *1285 with prejudice and its motion for fees and sanctions.

. See Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986); and Larios v. Cox, 300 F.Supp.2d 1320 (N.D.Ga.), aff'd, 542 U.S. 947, 124 S.Ct. 2806, 159 L.Ed.2d 831 (2004).

. The district court's order listed a correctly calculated $21,199.38 as the city's total attorneys’ fees up to dismissal, but used the same figure for the city's total attorneys’ fees seeking sanctions. Properly added, the total fees-seeking sanctions total $27,018.57. This brings the total of both sets of fees to $48,217.95, the amount the district court imposed.

. From its resolution filed on February 14, 2014, I see that the newly constituted city council had the same concern. In that resolution, the city council stated its belief that “citizens who stand up to challenge the actions of their government in court, especially where such actions impact their rights to effective participation in their government, should not be threatened with possibility of crushing financial penalties!)]” Appellant’s App. vol. II at 292.

. Here too, I see an irony that the City pursued the four Latino plaintiffs personally for sanctions in district court and on appeal, requiring extensive (and expensive) briefing in both courts, only to abandon that pursuit at oral argument in this court without notifying plaintiffs’ counsel beforehand and after the plaintiffs’ attorneys had expended scarce minutes of their oral argument time rebutting it.