JUNE 30, 2004

No. 03–1413. COX, GEORGIA SECRETARY OF STATE *v.* LARIOS
ET AL. Affirmed on appeal from D. C. N. D. Ga.

JUSTICE STEVENS, with whom JUSTICE BREYER joins,
concurring.

Today we affirm the District Court's judgment that Georgia's
legislative reapportionment plans for the State House of Repre-
sentatives and Senate violate the one-person, one-vote principle
of the Equal Protection Clause. The District Court's findings
disclose two reasons for the unconstitutional population deviations
in the state legislative reapportionment plans. The first was
"a deliberate and systematic policy of favoring rural and inner-
city interests at the expense of suburban areas north, east, and
west of Atlanta." 300 F. Supp. 2d 1320, 1327 (ND Ga. 2004). The
second was "an intentional effort to allow incumbent Democrats to
maintain or increase their delegation, primarily by systematically
underpopulating the districts held by incumbent Democrats, by
overpopulating those of Republicans, and by deliberately pairing
numerous Republican incumbents against one another." *Id.,* at
1329. The court found that Democratic incumbents "attempted
to draw districts that would enhance their own prospects at re-

election and further their other political ends (such as building up a support base for a future run for Congress)" and also "targeted particular Republicans to prevent their re-election." *Id.*, at 1330. As a result,

> "[w]hile Democratic incumbents who supported the plans were generally protected, Republican incumbents were regularly pitted against one another in an obviously purposeful attempt to unseat as many of them as possible. In the House Plan, forty-seven incumbents were paired, including thirty-seven Republicans, which was 50% of the Republican caucus, but only nine Democrats, comprising less than 9% of that caucus (as well as one Independent). Because six of the twenty-one districts involved were multi-member districts, the end result was that a maximum of twenty-eight of the paired incumbents could be re-elected, and the remaining nineteen would be unseated. Similarly, the 2002 Senate Plan included six incumbent pairings: four Republican-Republican pairings and two Republican-Democrat pairings. In the 2002 general election, eighteen Republican incumbents in the House and four Republican incumbents in the Senate lost their seats due to the pairings, while only three Democratic incumbents in the House and no Democratic incumbents in the Senate lost seats this way." *Id.*, at 1329–1330 (citations and footnote omitted).

Although "[t]he numbers largely speak for themselves," the District Court found that the shapes of many of the newly created districts supplied further evidence that the plans' drafters "inten[ded] not only to aid Democratic incumbents in getting re-elected but also to oust many of their Republican incumbent counterparts." *Id.*, at 1330. The court noted, for example, that a Republican senator had been "drawn into a district with a Democratic incumbent who ultimately won the 2002 general election, while an open district was drawn within two blocks of her residence," that two of the most senior Republican senators had been drawn into the same district, and that a Republican House member "who was generally disliked by several of the Democratic incumbent[s] was paired with another representative in an attempt to unseat him." *Ibid.* Moreover, many of the districts that paired Republicans were both oddly shaped and overpopulated, "suggesting that the districts were drawn to force Republi-

can incumbents to run against each other and to draw in as many Republican voters as possible in the process." *Ibid.*

The drafters' efforts at selective incumbent protection "led to a significant overall partisan advantage for Democrats in the electoral maps," with "Republican-leaning districts . . . vastly more overpopulated as a whole than Democratic-leaning districts," and with many of the large positive population deviations in districts that paired Republican incumbents against each other. *Id.*, at 1331. The District Court found that the population deviations did not result from any attempt to create districts that were compact or contiguous, or to keep counties whole, or to preserve the cores of prior districts. *Id.*, at 1331–1334. Rather, the court concluded, "the population deviations were designed to allow Democrats to maintain or increase their representation in the House and Senate through the underpopulation of districts in Democratic-leaning rural and inner-city areas of the state and through the protection of Democratic incumbents and the impairment of the Republican incumbents' reelection prospects." *Id.*, at 1334. The District Court correctly held that the drafters' desire to give an electoral advantage to certain regions of the State and to certain incumbents (but not incumbents as such) did not justify the conceded deviations from the principle of one person, one vote. See *Reynolds* v. *Sims*, 377 U. S. 533, 565–566 (1964) (regionalism is an impermissible basis for population deviations); *Gaffney* v. *Cummings*, 412 U. S. 735, 754 (1973) ("[M]ultimember districts may be vulnerabl[e] if racial or political groups have been fenced out of the political process and their voting strength invidiously minimized"). See also *Reynolds*, 377 U. S., at 579 (explaining that the "overriding objective" of districting "must be substantial equality of population among the various districts" and that deviations from the equal-population principle are permissible only if "incident to the effectuation of a rational state policy").

In challenging the District Court's judgment, appellant invites us to weaken the one-person, one-vote standard by creating a safe harbor for population deviations of less than 10 percent, within which districting decisions could be made for any reason whatsoever. The Court properly rejects that invitation. After our recent decision in *Vieth* v. *Jubelirer*, 541 U. S. 267 (2004), the equal-population principle remains the only clear limitation on improper districting practices, and we must be careful not to dilute its

strength. It bears emphasis, however, that had the Court in *Vieth* adopted a standard for adjudicating partisan gerrymandering claims, the standard likely would have been satisfied in this case. Appellees alleged that the House and Senate plans were the result of an unconstitutional partisan gerrymander. The District Court rejected that claim because it considered itself bound by the plurality opinion in *Davis* v. *Bandemer*, 478 U. S. 109 (1986), and appellees could not show that they had been "'essentially shut out of the political process.'" App. to Juris. Statement 86a (quoting *Bandemer*, 478 U. S., at 139). Appellees do not challenge that ruling, and it is not before us. But the District Court's detailed factual findings regarding appellees' equal protection claim confirm that an impermissible partisan gerrymander is visible to the judicial eye and subject to judicially manageable standards. Indeed, the District Court's findings make clear that appellees could satisfy either the standard endorsed by the Court in its racial gerrymandering cases or that advocated in Justice Powell's dissent in *Bandemer*, 478 U. S., at 173–185.*

Drawing district lines that have no neutral justification in order to place two incumbents of the opposite party in the same district is probative of the same impermissible intent as the "uncouth twenty-eight-sided figure" that defined the boundary of Tuskegee, Alabama, in *Gomillion* v. *Lightfoot*, 364 U. S. 339, 340 (1960), or the "dragon descending on Philadelphia from the west" that defined Pennsylvania's District 6 in *Vieth*, 541 U. S., at 340 (STEVENS, J., dissenting) (internal quotation marks omitted). The record in this case, like the allegations in *Gomillion* and in *Vieth*, reinforce my conclusion that "the unavailability of judicially

---

*A tally of the votes in the State Senate elections shows that, although Republicans won a majority of votes statewide (991,108 Republican votes to 814,641 Democrat votes), Democrats won a majority of the State Senate seats (30 to 26). See 2002 Georgia Election Results, www.sos.state.ga.us/ elections/election_results/2002_1105/senate.htm (as visited June 23, 2004, and available in Clerk of Court's case file). Thus, it appears that appellees also could state a partisan gerrymandering claim under JUSTICE BREYER's indicia of unjustified entrenchment. See *Vieth* v. *Jubelirer*, 541 U. S. 267, 366 (2004) (dissenting opinion) ("[a] the boundary-drawing criteria depart radically from previous or traditional criteria; [b] the departure cannot be justified or explained other than by reference to an effort to obtain partisan political advantage; and [c] a majority party [*i. e.*, party receiving majority of total votes in relevant election] has once failed to obtain a majority of the relevant seats in election using the challenged map").

manageable standards" cannot justify a refusal "to condemn even the most blatant violations of a state legislature's fundamental duty to govern impartially." *Vieth*, 541 U. S., at 341. I remain convinced that in time the present "failure of judicial will," *ibid.*, will be replaced by stern condemnation of partisan gerrymandering that does not even pretend to be justified by neutral principles.

JUSTICE SCALIA, dissenting.

When reviewing States' redistricting of their own legislative boundaries, we have been appropriately deferential. See *Mahan* v. *Howell*, 410 U. S. 315, 327 (1973). A series of our cases established the principle that "minor deviations" among districts—deviations of less than 10%—are "'insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State.'" *Brown* v. *Thomson*, 462 U. S. 835, 842 (1983) (quoting *Gaffney* v. *Cummings*, 412 U. S. 735, 745 (1973)); see also *Voinovich* v. *Quilter*, 507 U. S. 146, 160–162 (1993). This case presents a question that *Brown*, *Gaffney*, and *Voinovich* did not squarely confront— whether a districting plan that *satisfies* this 10% criterion may nevertheless be invalidated on the basis of circumstantial evidence of partisan political motivation.

The state officials who drafted Georgia's redistricting plan believed the answer to that question was "no," reading our cases to establish a 10% "safe harbor" with which they meticulously complied. The court below disagreed. No party here contends that, beyond grand generalities in cases such as *Reynolds* v. *Sims*, 377 U. S. 533, 577 (1964), this Court has addressed the question. The opinion below is consistent with others to have addressed the issue; there is no obvious conflict among the lower courts. This is not a petition for certiorari, however, but an appeal, and we should not summarily affirm unless it is clear that the disposition of this case is correct.

In my view, that is not clear. A substantial case can be made that Georgia's redistricting plan *did* comply with the Constitution. Appellees do not contend that the population deviations—all less than 5% from the mean—were based on race or some other suspect classification. They claim only impermissible *political* bias—that state legislators tried to improve the electoral chances of Democrats over Republicans by underpopulating inner-city and

rural districts and by selectively protecting incumbents, while ignoring "traditional" redistricting criteria. The District Court agreed. See App. to Juris. Statement 8a–25a.

The problem with this analysis is that it assumes "politics as usual" is not *itself* a "traditional" redistricting criterion. In the recent decision in *Vieth* v. *Jubelirer*, 541 U. S. 267 (2004), all but one of the Justices agreed that it *is* a traditional criterion, and a constitutional one, so long as it does not go too far. See *id.*, at 285–286 (plurality opinion); *id.*, at 307 (KENNEDY, J., concurring in judgment); *id.*, at 344 (SOUTER, J., dissenting); *id.*, at 355 (BREYER, J., dissenting). It is not obvious to me that a legislature goes too far when it stays within the 10% disparity in population our cases allow. To say that it does is to invite allegations of political motivation whenever there is population disparity, and thus to destroy the 10% safe harbor our cases provide. Ferreting out political motives in minute population deviations seems to me more likely to encourage politically motivated litigation than to vindicate political rights.

I would set the case for argument.