Reversed and remanded in part and affirmed in part by published opinion. Judge WYNN wrote the majority opinion, in which Judge GREGORY joined. Judge MOTZ wrote a dissenting opinion.
WYNN, Circuit Judge:
The right to vote is “fundamental,” and once that right “is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.” Bush v. Gore, 531 U.S. 98, 104-05, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (quotation marks and citation omitted). “It must be remembered that” the right to vote “can be denied by a debasement or dilution of the weight of a citizen’s vote just as effectively as by wholly prohibiting the free exercise.” Id. (quoting Reynolds v. *338 Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)).
In these consolidated cases, Plaintiffs, registered voters and civie organizations in Wake County, North Carolina, claim that under the two (identically drawn) redistricting laws they challenge, some Wake County School Board and Wake County Board of County Commissioners districts have been over-populated, while others have been under-populated. Plaintiffs further assert that these discrepancies result in some votes counting more while others count less, and that the discrepancies stem from illegitimate redistricting factors. As explained below, we agree, hold that Plaintiffs have proven their state and federal one person, one vote claims, and therefore reverse.
• Plaintiffs also claim that one discrete district was the product of racial gerrymandering. We hold that the district court did not clearly err in rejecting that claim and thus affirm.
I.
In the years leading up to 2013, the Wake County School Board (“School Board”) consisted of nine members elected from single-member districts. Those districts were subject to change every ten years following the decennial census.
In 2010, the census showed that Wake County’s population had grown by 43.51% over the preceding decade, causing the then-existing districting plan to have a maximum population deviation of 47.89%.[1] The School Board, at that time dominated by registered Republicans,[2] redrew its districts in light of the 2010 census.
That effort led to a redistricting plan with geographically compact districts having a maximum population deviation of 1.75% and no district deviating from the ideal district population by even 1%. The first election under the new districting, in Fall 2011, resulted in a School Board with a Democratic majority.
In 2013, the Republican-controlled North Carolina General Assembly (“General Assembly”), over the objection of a majority of the School Board and every Democratic and African-American legislator in the General Assembly, passed a local bill, Session Law 2013-110, making numerous changes to the School Board’s method of selection. Among other things, Session Law 2013-110 changed the School Board’s make-up from nine single-member districts to seven single-member districts and set less geographically compact boundaries for this new set of districts. The maximum population deviation among the new single-member districts swelled to over 7%.
*339 Additionally, Session Law 2013-110 created two “super districts” that overlaid the single-member districts. J.A. 160. One super district formed a donut of outer, more rural areas of the county, while the other formed a donut hole in the inner, urban area. The maximum population deviation between the super districts exceeded even that of the single-member districts — -just shy of 10%. Session Law 2013-110 moved elections to even-numbered years, and limited the School Board’s ability to make changes to its method of election until 2021.,
In August 2013, thirteen individuals and two civic organizations filed suit in the United States District Court for the Eastern District of North Carolina, challenging the constitutionality of the districts that Session Law 2013-110 established. The complaint alleged that the plan unevenly weighted the votes of citizens in the county for impermissible reasons, thereby violating the one-person, one-vote guarantees of the federal and state constitutions. In March 2014, the district court dismissed Plaintiffs’ suit for failure to state a claim. Wright v. North Carolina, 975 F.Supp.2d 539 (E.D.N.C. 2014). Plaintiffs appealed.
In April 2015, while Plaintiffs’ appeal was pending before this Court, the General Assembly enacted Session Law 2015-4, making the electoral system for the Wake County Board of County Commissioners (“Board of County Commissioners”) identical to the system it had created for the School Board with Session Law 2013-110.[3] With Session Law 2015-4, too, the General Assembly forced a local bill on Wake County despite opposition from the majori-. ty of the Board of County Commissioners, polled Wake County voters, nearly every Democratic state legislator, and every African-American legislator in the General Assembly. Fourteen individuals and a civic organization filed suit shortly thereafter, challenging the Board of County Commissioners’ redistricting plan as violating the one person, one vote guarantees of the state and federal constitutions.
In Plaintiffs’ appeal from the district court’s March 2014 dismissal, this Court, in May 2015, held that “Plaintiffs’ allegations in support of their claim that [Session Law 2013-110] violates the one' person, one vote principle suffice to survive a motion to dismiss for failure to state a claim.” Wright v. North Carolina, 787 F.3d 256, 269 (4th Cir. 2015). We therefore reinstated Plaintiffs’ complaint against the Wake County Board of Elections.
On remand, the district court consolidated the suits challenging Session Law 2013-110 and Session Law 2015-4 and expedited discovery. Discovery was further limited by the state legislators’ refusing Plaintiffs’ discovery requests, claiming legislative privilege.[4] In December 2015, the district court held a bench trial, in which Plaintiffs presented numerous witnesses, including legislators, citizens, and experts, as well as copious documentary evidence, with 481 exhibits including: 'expert reports and supporting data; school assignment maps; campaign finance reports; results data from various elections; excerpts of legislative transcripts; and public polling results. By contrast, Defendant, the Board of Elections that administers elections with no stake in the “political interests of the General Assembly,” Trial Tr. vol. I, 13:24-25, *340 presented none of its own. Defendant simply cross-examined Plaintiffs’ witnesses and made legal argument.
Nevertheless, the district court ruled for Defendant. Raleigh Wake Citizens Ass’n v. Wake Cty. Bd. of Elections, No. 5:13-CV-607-D, 166 F.Supp.3d 553, 2016 WL 1060378 (E.D.N.C. Feb. 26, 2016). The district court discredited every single one of Plaintiffs’ witnesses, for example as “anecdotal,” id. at 559-601, 2016 WL 1060378, at *28-29, and “unhelpful,” id. at 604-05, 2016 WL 1060378, at *32. It went on to hold, among other things, that “in order to prove a prima facie case in a one person one vote challenge, plaintiffs must at least negate the most common legitimate reasons that could explain the legislature’s action.” Id. at 589, 2016 WL 1060378, at *22 (quotation marks and citations omitted). The district court held that Plaintiffs failed to meet this and the other requisite burdens. Plaintiffs appealed.
II.
On appeal, “‘[w]e review judgments resulting from a bench trial under a mixed standard of review: factual findings may be reversed only if clearly erroneous, while conclusions of law are examined de novo.’ ” Nat’l Fed’n of the Blind v. Lamone, 813 F.3d 494, 502 (4th Cir. 2016) (quoting Plasterers’ Local Union No. 96 Pension Plan v. Pepper, 663 F.3d 210, 215 (4th Cir. 2011)). Findings will be deemed clearly erroneous if, for example, “even though there is some evidence to support the finding, the reviewing court, on review of the record, is left with a definite and firm conviction that a mistake has been made,” or if findings were made using “incorrect legal standards.” Consol. Coal Co. v. Local 1643, United Mine Workers of Am., 48 F.3d 125, 128 (4th Cir. 1995) (quotation marks and citation omitted). “Of course, if the trial court bases its findings upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard.” Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 855 n. 15, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982).
III.
With their primary argument on appeal, Plaintiffs contend that the district court applied the wrong legal standard for adjudicating their one person, one vote claim. For the reasons explained below, we agree.
A.
The right to vote is “fundamental,” and once that right “is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.” Bush, 531 U.S. at 104-05, 121 S.Ct. 525 (quotation marks and citation omitted). Indeed, allowing, through unequal apportionment amongst districts, a vote to be “worth more in one district than in another would ... run counter to our fundamental ideas of democratic government.” Reynolds, 377 U.S. at 563, 84 S.Ct. 1362 (quotation marks and citation omitted). This requirement that all citizens’ votes be weighted equally, known as the one person, one vote principle, applies not just to the federal government but also to state and local governments — including school boards and county governing bodies. Avery v. Midland Cty., 390 U.S. 474, 480, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968).
Courts have recognized that “[mjathematical exactness or precision is hardly a workable constitutional requirement” and thus do not require “identical numbers” in state and local government districts. Reynolds, 377 U.S. at 577, 84 S.Ct. 1362. Nevertheless, governments *341 must “make an honest and good faith effort” to construct districts as close to equal population “as is practicable.” Id. To assess what is “practicable,” the Supreme Court has allowed some population deviation for “legitimate considerations” such as compactness and contiguity, the integrity of political subdivisions, and balance among political parties. Harris v. Ariz. Indep. Redistricting Comm’n, — U.S.-, 136 S.Ct. 1301, 1306, 194 L.Ed.2d 497 (2016).
Generally, a districting plan “with a maximum population deviation under 10% will not, by itself, support an equal protection claim.” Wright, 787 F.3d at 264 (quotation marks omitted and emphasis added). Rather, plaintiffs in such cases “must show that it is more probable than not that a deviation of less than 10% reflects the predominance of illegitimate reapportionment factors rather than” legitimate considerations ,such as compactness or the integrity of political subdivisions. Harris, 136 S.Ct. at 1307.
In Harris, the Supreme Court’s most recent, and arguably most lucid, pronouncement as to plaintiffs’ burdens in one person, one vote cases below the 10% deviation threshold, the Court unanimously noted that the plaintiffs there had claimed that the plan’s deviations from “absolute equality of population reflect ... political efforts to help the Democratic party.” Id. Crucially, however, the plaintiffs “failed to prove this claim.” Id. Instead, “the record b[ore] out” that the deviations “predominantly reflected ... efforts to achieve compliance with the federal Voting Rights Act, not to secure political advantage for one party.” Id. In other words, the plaintiffs in Harris foundered not because their one person, one vote challenge failed as a matter of law, but because they did not muster the evidence needed to show it to be “more probable than not that [the] deviation of less than 10% reflected] the predominance of illegitimate reapportionment factors.” Id
By contrast, in Larios v. Cox, the plaintiffs succeeded in proving their one person, one vote claims. 300 F.Supp.2d 1320 (N.D. Ga.) (three-judge panel), aff'd, 542 U.S. 947, 124 S.Ct. 2806, 159 L.Ed.2d 831 (2004) (mem.). In Larios, a federal court struck down a Georgia redistricting plan that disproportionately favored Democrats by under-populating districts in the urban Atlanta region and the rural south — both Democratic strongholds— while over-populating suburban districts with Republican-leaning voters. The redistricting created a maximum population deviation of 9.98% and disproportionately protected Democratic incumbents. Id. at 1328-31. The Supreme Court (with only Justice Scalia dissenting) affirmed the district court’s rejection of the redistricting. Larios, 542 U.S. 947, 124 S.Ct. 2806.
As the Supreme Court has explained, in Larios, “those attacking the plan had shown that it was more probable than not that the use of illegitimate factors significantly explained deviations from numerical equality among districts.” Harris, 136 S.Ct. at 1310. The Supreme Court noted the “many examples showing that population deviation as well as the shape of many districts did not result from any attempt to create districts that were compact or contiguous, or to keep counties whole, or to preserve the cores of prior districts.” Id. (quotation marks and citation omitted). The Supreme Court contrasted the Larios plaintiffs’ successful showing with that of the failed plaintiffs in Harris, stating “[i]t is appellants’ inability to show that the present plan’s deviations and boundary shapes result from the predominance of similarly illegitimate factors that makes [Larios] inapposite here.” Id.
*342 Looking at Larios and Harris, we conclude that, to succeed on the merits, plaintiffs in one person, one vote cases with population deviations below 10% must show by a preponderance of the evidence that improper considerations predominate in explaining the deviations. This is just such a case, and that legal standard therefore applies.
B.
1.
The law in this area is challenging. In the earlier appeal of this matter, we sought to clarify some points to ease the burden on the district court. Nonetheless, there were numerous instances in which the law we set out in Wright was not adhered to. For example, in evaluating Plaintiffs’ one person, one vote claim, the district court did not properly characterize what Plaintiffs must show to succeed. The district court stated, for example, that “in order to prove a prima facie case in a one person one vote challenge, plaintiffs must at least negate the most common legitimate reasons that could explain the legislature’s action.” Raleigh Wake Citizens Ass’n, 166 F.Supp.3d at 589, 2016 WL 1060378, at *22 (quotation marks and citation omitted). The district court indicated that “any conceivable legislative purpose is sufficient” to support the redistricting plan and that those “attacking the rationality” thereof “have the burden to [negate] every conceivable basis which might support it.” Id. at 598, 2016 WL 1060378, at *27 (alteration in original) (quotation marks and citation omitted).
Contrary to the district court’s characterization, what Plaintiffs must actually show to succeed with their one person, one vote claims is that it is “more probable than not that a deviation of less than 10% reflects the predominance of illegitimate reapportionment factors.” Harris, 136 S.Ct. at 1307. This specific, deviation-focused inquiry differs markedly from the district court’s rational-basis review of whether a rational state policy could explain the redistricting generally.
2.
Further, in Wright, we emphasized the importance of the Supreme Court’s affir-mance of Larios for this case. Thus, we made it clear that Larios was more than a mere summary affirmance holding little sway. Raleigh Wake Citizens Ass’n, 166 F.Supp.3d at 584-86, 2016 WL 1060378, at *18. Instead, with Wright, we set forth precedent binding on the district courts of this Circuit making clear that Larios constitutes persuasive authority generally, as well as analogous authority in this concrete case. Wright, 787 F.3d at 267. The district court’s heavy emphasis on Justice Scalia’s Larios dissent&emdash;an opinion with no prece-dential value&emdash;is thus squarely at odds with Wright. See, e.g., Raleigh Wake Citizens Ass’n, 166 F.Supp.3d at 584-86, 2016 WL 1060378, at *18-19 (“According to Justice Scalia, ‘politics as usual’ is a ‘traditional redistricting criterion,’ and ‘a constitutional one,’ ” and “ ‘[f]erreting out political motives in minute population deviations seems to me more likely to encourage politically motivated litigation than to vindicate political rights.’ ”).
Moreover, the district court misapplied the core principles of Larios. The district court stated, for example, that, in contrast to Larios, Plaintiffs here did not prove “that the General Assembly disregarded all districting principles in creating the 2013 Wake County School Board Plan, or that the 2013 Wake County School Board Plan is not rationally related to a permissible, rational state policy of improving School Board representation.” Raleigh Wake Citizens Ass’n, 166 F.Supp.3d at 611, *343 2016 WL 1060378, at *36. The district court thus concluded that “unlike Larios, plaintiffs have failed to prove that the 2013 Wake County School Board Plan resulted from a desire to favor suburban and rural voters over urban voters.” Id.
Crucially, neither the three-judge district court in Larios, nor the Supreme Court in affirming and later discussing Larios, ever suggested that plaintiffs in such cases need to show that “all district-ing principles” were “disregarded.” Id. Further, neither court focused on the challenged redistricting plans as a whole. Instead, the focus, in Larios as well as, Harris, was whether “deviation[s] of less than 10% reflected] the predominance of illegitimate reapportionment factors.” Harris, 136 S.Ct. at 1307 (emphasis added); Lar-ios, 300 F.Supp.2d at 1338 (holding that “population deviations ... not supported by ... legitimate interests ... cannot withstand constitutional scrutiny” (emphasis added)). In Larios, the state legislature’s attempt to privilege rural and urban Democrats at the expense of suburban Republicans explained the deviations in population, not the redistricting plan generally, did not constitute a legitimate apportionment factor, and was prohibited. Larios, 300 F.Supp.2d at 1338.
3.
Additionally, in evaluating the evidence Plaintiffs proffered to support their one person, one vote claims, the district court improperly discounted every single one of Plaintiffs’ fifteen trial witnesses. For example, it discredited all the testifying legislators because of their “strong legislative opposition to the 2013 Wake County School Board Plan. [The pertinent] testimony at trial fits within the line of precedent giving no weight to statements made by opponents of legislation.” Raleigh Wake Citizens Ass’n, 166 F.Supp.3d at 600, 2016 WL 1060378, at *29.
The only analogous case in the purported “line of precedent,” Veasey v. Abbott, 796 F.3d 487 (5th Cir. 2015), has been vacated and is thus no longer good law, 815 F.3d 958 (5th Cir. 2016) (granting rehearing en banc and vacating the panel opinion). The other cases the district court cited — cases dealing with statutory interpretation — stand for the unremarkable and inapposite proposition that courts usually do not “accord much weight to the statements of a bill’s opponents [when interpreting the words of the bill]. The fears and doubts of the opposition are no authoritative guide to the construction of legislation.” Shell Oil Co. v. Iowa Dep’t of Revenue, 488 U.S. 19, 29, 109 S.Ct. 278, 102 L.Ed.2d 186 (1988) (quotation marks, citation, and brackets omitted) (holding that one passing reference to preemption in a speech by an opponent of a law cannot properly guide the court’s interpretation of that law); see also Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 394, 71 S.Ct. 745, 95 L.Ed. 1035 (1951) (noting that “doubts of the opposition” do not guide “the construction of legislation”); NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760, 377 U.S. 58, 66, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964) (same).
This is not a case about what a particular word in a statute means. Rather, at the heart of this case is whether illegitimate factors predominated the General Assembly’s supplemental redistricting of Wake County such that illegitimate factors explain the population deviations in the redistricting plan. While we recognize that a trial judge generally may consider “bias or prejudice” when “assessing witness credibility,” United States v. Muse, 83 F.3d 672, 676-77 (4th Cir. 1996), the district court discredited categorically the *344 legislators’ testimony, even regarding objective facts. Yet the district court has cited, and we see, no controlling precedent suggesting that their testimony should simply have been discounted wholesale and “giv[en] no weight.” Raleigh Wake Citizens Ass’n, 166 F.Supp.3d at 600, 2016 WL 1060378, at *29.
Similarly, the district court completely rejected as “materially flawed and unhelpful,” id. at 604, 2016 WL 1060378, at *32, the analysis of Plaintiffs’ expert Dr. Jowei Chen, a political science professor from the University of Michigan. Upon closer inspection, however, it is the district court’s own analysis of Dr. Chen’s analysis that is materially flawed.-
Dr. Chen analyzed whether the population deviations in the seven single-member district plans and the two super districts plans were motivated by a partisan purpose using computer simulation programming techniques that allow him to generate randomly a large number of alternative redistricting plans created subject to traditional redistricting criteria. The four traditional redistricting criteria Dr. Chen used were: population equality; keeping municipalities intact; keeping precincts whole; and geographic compactness. Dr. Chen’s computer simulations are based on the logic that if a computer randomly draws five hundred redistrieting plans following traditional redistricting criteria, and the actual enacted plans fall completely outside the range of what the computer has drawn, one can conclude that the traditional criteria do not explain that enacted plan.
The computer simulations led Dr. Chen to just that conclusion: that the “enacted districting plans create a partisan distribution of seats falling completely outside the range of outcomes that are possible under a non-partisan districting process that creates equally populated districts while maximizing compactness and preserving precinct and municipal boundaries.” J.A. 768. Dr. Chen thus concluded “with extremely high statistical certainty, beyond any sort of doubt here” that “the only way to draw districts as extreme in partisanship as the legislature’s B and A districts is to use population deviations” that are high. J.A. 463. In other words, Dr. Chen testified that he could conclude with certainty from his simulations that the deviations at issue here are the result of using partisanship in apportioning the districts.
In' critiquing Dr. Chen’s analysis, the district court seized on the fact that certain criteria accounted for in the computer simulations — such as setting maximum population deviation at 2% or less or “completely ... ignoring] partisanship,” Raleigh Wake Citizens Ass’n, 166 F.Supp.3d at 603, 2016 WL 1060378, at *30, are required by neither state nor federal law. This critique misses the point: The point is not that the simulated plans are legally required, but rather that they help demonstrate what might explain the population deviations in the enacted plan.
The district court went on to “find[] that Dr. Chen’s simulations simply show that ‘better’ ... redistricting plans were possible, but ‘better’ plans do not equate to the unconstitutionality of the 2013 Wake County School Board Plan.” Id. With that finding, the district court again missed the point: The import of Dr. Chen’s simulations was not to produce better plans, but rather to hold several legitimate apportionment considerations constant so that Dr. Chen could assess whether the population deviations in the challenged plans could have been the product of something other than partisan bias. He concluded “with extremely high statistical certainty, beyond any sort of doubt here” that they could not have. J.A. 463. The district court clearly and reversibly erred in rejecting Dr. Chen’s expert testimony. Eas- *345 ley v. Cromartie, 532 U.S. 234, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001) (reversing a three-judge district court panel in a racial gerrymandering case in which the district court clearly erred in rejecting expert evidence).
4.
We could go on detailing the errors in the opinion below. Suffice it to say that the legal analysis of what Plaintiffs needed to show as well as the evaluation of the evidence Plaintiffs proffered to make that showing are fundamentally flawed.
C.
1.
When, as here, the district court applies the wrong standards, we tend to remand to allow “the trier of fact to reexamine the record” using the correct standards. Kelley v. S. Pac. Co., 419 U.S. 318, 332, 95 S.Ct. 472, 42 L.Ed.2d 498 (1974). However, when “the record permits only one resolution of the factual issue,” Pullman-Standard v. Swint, 456 U.S. 273, 292, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), remand is unnecessary, and we may rule based on the record before us. Thus, for example, in the recent Class v. Towson University opinion, this Court, based on the record before it, straight-out reversed the district court, which had applied the incorrect legal standard following a bench trial. 806 F.3d 236 (4th Cir. 2015). And in Cromartie, 532 U.S. 234, 121 S.Ct. 1452, the Supreme Court outright reversed a three-judge district court panel in a racial gerrymandering case because, among other things, the district court had clearly erred in rejecting pertinent expert evidence.
Likewise, here, we deem remand unnecessary. At trial, in addition to copious documentary evidence, Plaintiffs presented fifteen live witnesses — two experts, four legislators, four county elected officials, and five plaintiffs and lay witnesses.[5] These witnesses and documents presented abundant support for Plaintiffs’ one person, one vote claims within the nine-hour total that the district court allowed Plaintiffs for presenting their case.
Defendant, by contrast, offered not even one witness. Instead, Defendant expressly disclaimed any stake in “representing the political interests of the General Assembly,” Trial Tr. vol. I, 13:24-25, and essentially passed on defending the General Assembly’s redistricting. Even the legislative proponents of the challenged redistrieting -laws refused to defend their actions, instead claiming legislative immunity.
The resulting record, discussed in more detail below, permits only one resolution of Plaintiffs’ one person, one vote claims: Plaintiffs have proven that it is more probable than not that the population deviations at issue here reflect the predominance of a illegitimate reapportionment factor, Harris, 136 S. Ct. at 1307 — namely an “intentional effort” to create “a significant ... partisan advantage,” Larios, 542 U.S. at 947-49, 124 S.Ct. 2806 (Stevens, J., concurring). In other words, Plaintiffs have successfully made their case.
2.
First putting the challenged plans in context, the evidence at trial showed that that Wake County’s population generally, and the overall population deviation amongst the School Board districts in particular, swelled significantly by the time of the 2010 decennial census. Accordingly, *346 the School Board redrew its election maps. The resulting 2011 redistricting plan reduced maximum population deviation down to 1.75%, with no single district deviation reaching even 1% from the ideal. The districts were “vetted” by county residents and the members of'the School Board, and were considered relatively compact, contiguous, and respectful of communities of interest. J.A. 210. The Board of County Commissioners also redrew its residency districts after the 2010 decennial census.
Despite the fact the 2011 redistricting had been shepherded by a “Republican School Board” and that a “Republican lawyer” had drafted the districts, J.A. 420, the 2011 elections, the first administered under the new plan, resulted in a “shift[ ] from the Republicans to the Democrats.” J.A. 200. The Republican-controlled General Assembly then intervened with the redistricting plans that are the subject of this action.
Uncontroverted testimony and evidence adduced at trial showed that the legislative process relating to Session Law 2013-110 was truncated by, for example, not having “community hearings and participation of the affected parties,” J.A. 211, and failing to incorporate “any of the ideas that people ... proffered,” id. without even “discussing it amongst the [Wake County] delegation first,” a “stark departure” from common practice, J.A. 419. As School Board Member Bill Fletcher, a registered Republican, put it, “nothing was discussed. There was no opportunity to provide input, to have a debate or discussion about different election strategies, it was simply drafted in a bill and presented and passed with little opportunity for rational thought.” J.A. 263.
3.
Moving on to the showing Plaintiffs needed to make on their one person, one vote claims, uncontroverted evidence at trial showed that the deviations resulting from the latter-day redistricting more likely than not reflected the predominance of illegitimate reapportionment factors.
Plaintiffs proffered uncontroverted evidence of an illegitimate factor predominating in the skewed, unequal redistricting: an attempt to guaranty Republican victory through the intentional packing of Democratic' districts. Various witnesses testified that “the true motivation[ ]” for the redistricting was to “ensure Republican control ... at the expense of Democrats.” J.A. 364. The “real reason” behind the redistricting was “[t]o ensure a Republican majority ... despite the vote totals,” J.A. 405, a “kind of punitive and retributive effort to punish the Democrats for winning,” J.A. 392.
Plaintiffs’ expert Anthony Fairfax analyzed the challenged redistricting plans and reported, among other things, that “[t]here was a marked pattern of overpopulation in Democratic-performing districts, and underpopulation in Republican-performing districts.” J.A. 805. And as Mr. Fairfax noted in his testimony, “by overpopulating you obviously minimize the Democratic performance in other districts, other surrounding districts.” J.A. 305.[6]
*347 Plaintiffs’ second expert, Dr. Chen, conducted an analysis showing that “[t]he General Assembly’s enacted districting plans create a partisan distribution of seats falling completely outside the range of outcomes that are possible under a nonpartisan districting process that creates equally populated districts while maximizing compactness and preserving precinct and municipal boundaries.” J.A. 768. In other words, as Dr. Chen testified at trial, “the only way to achieve a districting plan that allowed for such an extreme partisan Republican control over four districts out of seven, the only way to create such an extreme partisan plan was to deviate from population equality to a great extent.” J.A. 466-67.
The legislators who hatched the redistricting plans claimed legislative immunity. Absent from the record, therefore, is any trial testimony confirming (or denying) a partisan motive behind the redistricting and its deviations.[7] The record does, however, contain several e-mails including third parties, the only category of e-mails Plaintiffs managed to obtain, that indeed suggest a partisan motive behind the redistricting and its deviations. For example, the Wake County Republican Party Chair exchanged several e-mails with, and apparently met with, key legislators involved in the redistricting, with a focus on “how we would take 5 of the 9 seats.” J.A. 1114.
We do not doubt that some amount of partisan politics is par for the course in redistricting generally. For example, in Gaffney v. Cummings, a case on which the district court relied here, the Supreme Court upheld a redistricting plan drawn based on partisan considerations. 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973). But the facts in and consequences of Gaff-ney differ markedly and tellingly from those here. In Gaffney, a state legislature had drafted a redistricting plan following a decennial census; in doing so, it followed a “policy of ‘political fairness.’ ” Id. at 738, 93 S.Ct. 2321. The plan, which exhibited less than 2% overall deviation in the state senate and less than 8% overall deviation in the state house, sought “proportional representation of the two major political parties .... [T]he Board took into account the party voting results .in the preceding three statewide elections, and, on that basis, created what was thought to be a proportionate number of Republican and Democratic legislative seats.” Id.
In this case, by contrast, rather than seeking proportional representation of the two main political parties, the evidence shows that the challenged plans underpopulated Republican-leaning districts and over-populated Democratic-leaning districts in order to gerrymander Republican victories.[8] In other words, the challenged *348 redistricting here subverts political fairness and proportional representation and sublimates partisan gamesmanship. Gaff-ney simply cannot reasonably be read as supporting that; if anything, it does the opposite. Indeed, the Supreme Court suggested that partisanship is not a legitimate reason to weight some votes more than others, and the Gaffney Court itself underscored that redistricting so as to “minimize” the “political strength” of a party or group would be constitutionally “vulnerable.” Id. at 754, 93 S.Ct. 2321.
Further, the Supreme Court rejected just such partisan deviation games in Lar-ios, 542 U.S. 947, 124 S.Ct. 2806, indicating that “if a plan contains any population deviations, a court may decide that the deviations are caused by impermissible partisanship and strike the plan down ... for failure to comply with one person, one vote.” Samuel Issacharoff & Pamela S. Karlan, Where to Draw the Line?: Judicial Review of Political Gerrymanders, 153 U. Pa. L. Rev. 541, 567-68 (2004); see Larios, 300 F.Supp.2d at 1338 (holding that pertinent “population deviations” were “not the result of an effort to further any legitimate” policy but were instead “systematically and intentionally created” to “protect Democratic incumbents” and holding that that did not “withstand! ] Equal Protection scrutiny”).
We recognize that the Supreme Court has not yet clarified when exactly partisan considerations cross the line from legitimate to unlawful. See, e.g., Harris v. McCrory, No. 1:13-CV-949, 2016 WL 3129213, at *2 (M.D.N.C. June 2, 2016) (citing Larios, 542 U.S. 947,124 S.Ct. 2806, for the proposition that redistricting plans may be challenged “when partisan considerations go ‘too far,’ ” while citing Vieth v. Jubelirer, 541 U.S. 267, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004), for the lack of “judicially discernible and manageable standards for adjudicating political gerrymandering claims”). Yet it is important to bear in mind that only a plurality (i.e., not a controlling majority) of the Supreme Court has suggested that partisanship-based redistricting claims should be considered nonjusticiable.[9] Id. And shortly after Vieth, a nearly unanimous Supreme Court, including three Justices from the Vieth plurality, affirmed Larios, in which the lower court struck down a redistricting plan with population deviations under 10% as a blatant and unlawful attempt at partisan favoritism. Larios, 542 U.S. 947, 124 S.Ct. 2806.[10]
*349 4.
Not only did the uncontested record evidence demonstrate that illegitimate reapportionment factors predominated, resulting in an overall deviation of barely under 10%; the evidence also exposed the stated reasons for the redistricting as pretextual. For example, one stated goal of the School Board’s redistricting was to increase the alignment between citizen’s voting districts and their assigned schools. Uneontroverted testimony at trial indicated that the redistricting resulted in the opposite, “mak[ing] alignment worse.” J.A. 235. Indeed, “[j]ust a perfect downtown example is Daniels Middle School and Broughton High Sehool[, which] are in the same feeder pattern, they were in the same district under the 2011 maps ... but they were in different districts under the [new] map” challenged here. J.A. 424. Further, even if increased alignment were indeed a goal, it need not necessarily have resulted in population deviations amongst the districts.
A second stated rationale for the redistricting debunked at trial: reducing campaign costs. As trial testimony demonstrated, “the proponents of this legislation said that they were concerned about the cost of campaigning and that these districts would make it cheaper to run. ... That is either inaccurate or deceptive, because Wake County is a media market and if you’re going to run in any of these widespread districts here or if you’re going to run all in the entire county you are still going to be advertising in the Raleigh/Wake media market, [and] it’s still expensive.” J.A. 395-96. Further, moving down-ballot races like those for School Board members to even years that include congressional and presidential races is “going to dramatically increase the costs of running” in those elections, J.A. 420, even simply for candidates “to have any visibility in a Presidential election cycle.” J.A. 258. And, again, nothing about this stated rationale, cost reduction, explains the population deviation amongst the districts.
Another stated goal of the redistricting legislation — increasing voter turnout — also has nothing to do with re-drawing districts, much less re-drawing them unequally. The district court noted that “Plaintiffs do not dispute the other legislative goal of increasing voter turnout by having ... elections in even-numbered years.” Raleigh Wake Citizens Ass’n, 166 F.Supp.3d at 599 n. 18, 2016 WL 1060378, at *27 n. 18. But they did not need to dispute that goal, because it has no logical connection to, and does not justify, re-drawing districts, much less districts with population deviations.
A further rationale given for the redistricting: allowing voters greater representation. Yet the redistricting of the County Commission arguably reduced citizens’ opportunity to cast votes for their preferred commissioners by moving away from an all at-large system. As testified at trial, voters “had the ability to elect all seven members .... As it stands with the maps that were passed by the House and the Senate, [they] will be able to exercise [their] vote on only two of those members, so with every — everything that I know about the word representation, that’s less.” J.A. 387-88. And again, nothing about this goal explains the population deviations of the districts as drawn.
Moreover, alternatives were suggested that would have achieved, even more effectively, the stated rationale of increased representation without resulting in such great population deviations. For example, Representative Darren Jackson proposed an amendment to create two purely at large districts instead of the donut and donut hole districts, while maintaining the 2011 single-member districts. Such a plan would have “accomplishfed] both of the *350 Republicans’ stated goals, to give you more representation on the School Board and to make sure that you had a School Board member who represented your child’s school, and it accomplished both of those goals.” J.A. 354. That amendment, which would have achieved greater representation on the School Board, was rejected— yet more evidence that the stated rationales were pretextual and fail to justify the population deviations in the challenged redistricting.
The legislators pushing the redistricting also sought to ground it in administrative ease, having the School Board and Board of County Commissioners fall under the same plan. Again, that goal is wholly unrelated to, and plainly fails to justify, the deviations in population amongst the districts. Somewhat relatedly, and certainly breathtakingly under the circumstances, the Board of County Commissioners’ redistricting was ostensibly intended to “avoid litigation.” Raleigh Wake Citizens Ass’n, 166 F.Supp'3d at 612-13, 2016 WL 1060378, at *37. Yet the School Board redistricting was being actively litigated and was in fact pending before this Court at that time. The litigation rationale is thus utterly irrational and, further, has no logical connection to the deviations at issue.
Moving beyond the pretextual rationales, the record evidence demonstrates that traditional, legitimate apportionment factors did not predominate. On the contrary, the redistricting resulted in: “a total of 31 [split] precincts” (as opposed to 12 split precincts under the 2011 plan), J.A. 805; bizarrely shaped districts, including “donut[s]” and “donut munehkin[s],” J.A. 432, “crab claw[s]” and “pincer[s],” J.A. 212; and obviously non-compact districts that make it harder, for example, for School Board members “to have more detailed knowledge about [their] own districts,” J.A. 280.[11] Indeed, Plaintiffs’ expert Dr. Chen considered several traditional, legitimate reapportionment criteria, i.e., population equality, community and precinct boundaries, and geographical .compactness, and found that the redistricting “create[d] a partisan distribution of seats falling completely outside the range of outcomes that are possible under a non-partisan districting process that creates equally populated districts while maximizing compactness and preserving precinct and municipal boundaries.” J.A. 768.
Representative Rosa Gill also proposed an alternative redistricting during the legislative process. Her proposal demonstrated that it was entirely possible to meet all of the stated rationales for the skewed redistricting — including giving voters the opportunity to elect two school board members, providing district representation for the County Commissioners, moving school board elections to even numbered years to increase turnout, reducing voter confusion by using the same districts for both the School Board and the Board of County Commissioners, and reducing costs — while creating only miniscule deviations. Representative Gill’s plan divided no precincts and had overall deviations in the single-member and super districts of less than 0.5%. J.A. 795-96.
The trial court dismissed the evidence of Representative Gill’s alternative plan because it “simply shows that ‘better’ plans can be. drawn, but ‘better’ plans do not equate to unconstitutionality.” Raleigh Wake Citizens Ass’n, 166 F.Supp.3d at 605, 2016 WL 1060378, at *33. In fact, what the alternative plan shows is that legitimate considerations, including the stated rationales for the redistricting, utterly failed to *351 explain or justify the high levels of deviation in the enacted plans — because those rationales could have been accomplished by a plan with virtually no population deviations.
5.
At the end of the day, when we review the evidentiary record, we can reach only one conclusion: that Plaintiffs, the only parties to make their case at trial, successfully showed it to be more probable than not that the deviations at issue here reflect the predominance of an illegitimate reapportionment factor rather than legitimate considerations. Harris, 136 S.Ct. at 1307. We recognize that, generally, “attacks on deviations under 10% will succeed only rarely, in unusual cases.” Id. But after reviewing this matter closely, and for the reasons discussed above, we are convinced that these mid-decadé, partisan redistricting plans constitute just such an unusual case. The district court therefore committed reversible error in granting judgment in Defendant’s favor.
6.
In addition to improper partisanship, Plaintiffs claimed improper regional favoritism as an illegitimate factor behind the deviations in the challenged reapportion-ments. Because we have already ruled in Plaintiffs’ favor based on partisanship, we need not reach this related but separate basis. We nevertheless note that “[a] citizen, a qualified voter, is no more nor no less so because he lives in the city or on the farm. This is the clear and strong command of our Constitution’s Equal Protection Clause.” Reynolds, 377 U.S. at 568, 84 S.Ct. 1362. Therefore, “[i]n Larios, a federal court struck down a [state] legislative redistricting plan.... The plaintiffs there alleged that the plan ... underpopulated] districts in the urban Atlanta region and the rural south-Georgia area— both Democratic strongholds — while overpopulating districts with Republican-leaning voters.” Wright, 787 F.3d at 266-67. In Wright, we left no doubt that, as in Larios, Plaintiffs here claim that “a state legislature designed a redistricting plan with a maximum deviation in population of just under 10%, designed to pit rural and urban voters against one another” and that “[e]ven if Larios does not control this case ..., we nevertheless find it” and its rejection of regional favoritism as a basis for deviating from ideal population by such margins “persuasive.” Id. at 267.
Moreover, the district court held that “the General Assembly rationally considered the communities of interest within Wake County’s urban areas and within Wake County’s rural and suburban areas in adopting” the challenged redistricting plans. Raleigh Wake Citizens Ass’n, 166 F.Supp.3d at 615-16, 2016 WL 1060378, at *40. But the pertinent inquiry is not whether it was “rational” to “consider” communities of interest in adopting the plans generally; instead, the proper inquiry is whether the redistricting’s deviations more likely than not reflect the predominance of illegitimate reapportionment factors. Harris, 136 S.Ct. at 1307. The district court plainly engaged the wrong legal standard in its analysis of this factor. But because we rule on the basis of partisanship, we need go no further of the regional favoritism issue.
D.
In addition to their federal constitutional one person, one vote claim, Plaintiffs brought a similar North Carolina state claim. Under the North Carolina Constitution, “[t]he right to vote on equal terms in representative elections — a one-person, one-vote standard — is a fundamental right.” Blankenship v. Bartlett, 363 N.C. *352 518, 681 S.E.2d 759, 762-63 (2009). A North Carolina analysis of the state’s “Equal Protection Clause generally follows the analysis of the Supreme Court of the United States in interpreting the corresponding federal clause.” Id. at 762. If anything, North Carolina’s one person, one vote principle applies with even more force than its federal counterpart. See, e.g., id. at 763 (deeming the one person, one vote principle applicable in North Carolina’s election of superior court judges even though “federal courts have articulated that the ‘one-person, one-vote’ standard is inapplicable to state judicial elections”); Stephenson v. Bartlett, 355 N.C. 354, 562 S.E.2d 377, 397 (2002) (requiring legislative districts to be within plus or minus five percent of ideal population). Accordingly, for the same reasons that Plaintiffs succeed with their federal claim, so, too, do they succeed with their North Carolina state one person, one vote claim.
IV.
In addition to their one person, one vote claim, Plaintiffs have also brought a racial gerrymandering claim regarding the Board of County Commissioners’ District 4.[12] Plaintiffs contend that race predominated in determining the boundaries, shape, and composition of that district without narrow tailoring to serve a compelling state interest. As explained below, the district court did not commit clear error in rejecting this claim.
A.
To successfully challenge the constitutionality of an electoral district under the Equal Protection Clause, a plaintiff must “show, either through circumstantial evidence of a district’s shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating thé legislature’s decision to place a significant number of voters within or without a particular district.” Ala. Legislative Black Caucus v. Alabama, — U.S. -, 135 S.Ct. 1257, 1267, 191 L.Ed.2d 314 (2015) (quotation marks and citation omitted).
Such a showing requires proof that “the legislature subordinated traditional race-neutral districting principles ... to racial considerations.” Miller v. Johnson, 515 U.S. 900, 916, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995). Traditional race-neutral principles include “compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests,” id. incumbency protection, and political advantage, Bush v. Vera, 517 U.S. 952, 964, 968, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996). And evidence that such traditional principles took a back seat to racial considerations may include direct and circumstantial evidence of legislative intent, indications that a racial percentage within a given district was non-negotiable, bizarre or non-compact district shapes, and district lines that cut through traditional geographic boundaries or election precincts. See, e.g., Vera, 517 U.S. at 970-71, 116 S.Ct. 1941; Miller, 515 U.S. at 917-18, 115 S.Ct. 2475; Shaw v. Reno, 509 U.S. 630, 646-48, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993).
If a plaintiff successfully shows racial predominance in drawing the lines of a district, the court must apply “strictest scrutiny,” Miller, 515 U.S. at 915,115 S.Ct. 2475, that is, it must determine whether the design of the challenged district was narrowly tailored to advance a compelling state interest — a burden the state must *353 bear, Shaw v. Hunt, 517 U.S. 899, 908, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996). If the answer to that question is no, the district must be struck as unconstitutional.
B.
In contrast to its one person, one vote analysis, the district court did not miscomprehend the applicable law. Accordingly, while we were “not bound by the clearly erroneous standard” regarding the one person, one vote findings, Inwood Labs., 456 U.S. at 855 n. 15, 102 S.Ct. 2182, the same cannot be said here. Here, we must affirm if “the district court’s account of the evidence is plausible,” even if we are “convinced that we would have decided the question of fact differently.” TFWS, Inc. v. Franchot, 572 F.3d 186, 196 (4th Cir. 2009) (quotation marks and citation omitted).
While we might have decided this matter differently in the first instance, we cannot say that the district court’s account of the evidence is not plausible; it is. For example, the district court considered legislator comments indicating that race was a consideration in the redistricting process, such as a representative’s observation “that at-large electoral systems submerge the views of various minorities, ‘whether it’s racial, gender, political, rural, urban or whatever.’ ” Raleigh Wake Citizens Ass’n, 166 F.Supp.3d at 624, 2016 WL 1060378, at *46. While such comments evidence the fact that race was a consideration in the redistricting process, doing so is not unlawful. See, e.g., Miller, 515 U.S. at 916, 115 S.Ct. 2475 (“Redistricting legislatures will, for example, almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process.”). We cannot fault the district court for determining that the comments here did not constitute direct evidence that race predominated in the drawing of District 4, i.e., of racial gerrymandering.
Further, in the racial gerrymandering context, partisan advantage may be considered a traditional redistricting criterion, and evidence that politics was the primary motivation for the drawing of a district can defeat an allegation that race predominated. See, e.g., Cromartie, 532 U.S. at 257-58, 121 S.Ct. 1452; Vera, 517 U.S. at 968, 116 S.Ct. 1941. The district court recognized this, noting that the fact that District 4 is majority-minority “alone does not mean that the General Assembly racially gerrymandered District 4,” Raleigh Wake Citizens Ass’n, 166 F.Supp.3d at 625, 2016 WL 1060378, at *47, and that evidence supports the district’s having been drawn with a focus on partisanship rather than race. For example, in evaluating the expert support for Plaintiffs’ racial gerrymandering claim, the district court noted that the expert’s “partisan neutral” analysis did not help answer the question of whether politics or race led to District 4’s boundaries. Id. Here, too, we cannot disagree.
In sum, even if we might have found otherwise in the first instance, it was not implausible for the district court to determine that Plaintiffs had fallen short of proving that traditional districting criteria were subordinated to race in the drawing of District 4. Accordingly, because the district court’s analysis of Plaintiffs’ racial gerrymandering claim is not clearly erroneous, we affirm on that issue.
V.
For the reasons discussed above, we reverse the district court’s judgment in Defendant’s favor as to Plaintiffs’ one person, one voté claims. We remand with *354 instructions to enter immediately[13] judgment for Plaintiffs, granting both declaratory relief and a permanent injunction, as to the one person, one vote claims. However, we. affirm the district court’s judgment for Defendant as to Plaintiffs’ racial gerrymander claim.
REVERSED AND REMANDED IN PART AND AFFIRMED IN PART

. "[C]ourts usually analyze! ] apportionment plan[s] in terms of the maximum population deviation among the districts. Generally, to calculate maximum deviation, the court first constructs a hypothetical ideal district by dividing the total population of the political unit (e.g., state or county) by the total number of representatives who serve that population. Then, the court determines how much the actual population of each district varies from the population of the ideal district. This deviation is expressed as a percentage of the ideal population. Maximum deviation is the sum of the absolute value of the deviation of the district with the smallest population and that of the district with the largest population.” Daly v. Hunt, 93 F.3d 1212, 1215 n. 2 (4th Cir. 1996).

. While the School Board is nominally nonpartisan, its members are routinely registered and affiliated with the Democratic and Republican Parties, and uncontroverted trial testimony showed a high level of partisanship in "what's supposed to be a nonpartisan election.” J.A. 234; see also, e.g., J.A. 254 (noting that such local races have “become more partisan-based” due to "block candidates,” the "political party machine,” and "money”).

. Previously, members of the Board of County Commissioners were elected at-large, subject to the requirement that one member had to be elected from each of the county's seven residency districts.

. Pursuant to an agreement between' Plaintiffs and particular legislators, certain external communications between the legislators and third parties — but no internal communications amongst the legislators — were produced.

. The district court did not deem any of Plaintiffs’ witnesses to be untrustworthy. Raleigh Wake Citizens Ass'n, 166 F.Supp.3d 553, 2016 WL 1060378.

. The district court discounted Mr. Fairfax’s testimony just as it did every single one of Plaintiffs’ other witnesses. And in the case of Mr. Fairfax, as with the others, the bases for that discounting fall apart upon careful inspection. For example, the district court faulted Mr. Fairfax for using election results data, asserting that he “failed to analyze voter registration data in Wake County.” Raleigh Wake Citizens Ass’n, 166 F.Supp.3d at 607, 2016 WL 1060378, at *34. Yet in focusing on election results instead of registration data, Mr. Fairfax followed precisely what the Supreme . Court has instructed those analyzing redistricting plans to do. See, e.g., Cromartie, 532 U.S. at 239, 121 S.Ct. 1452 (noting its instruc *347 tion that courts should look to “data showing how voters actually behave, not data showing only how those voters are registered’’).

. Both the district court and Defendant make much ado of the admissions the legislators made in Larios, noting the direct evidence that legislators purposefully skewed district deviations along urban, suburban, and rural divides to achieve partisan goals. See, e.g., Appellee’s Br. at 41; Raleigh Wake Citizens Ass'n, 166 F.Supp.3d at 584-86, 2016 WL 1060378, at *18. Both Defendant and the district court contrast those facts with this case, with its lack of such direct evidence. But here, the lack of direct evidence may have its roots in the legislators' avoiding discovery through claims of legislative immunity. Moreover, direct evidence is simply not required.

. The district court played up the fact that District 5 and District 6 constitute exceptions to the rule that Democratic-leaning districts were over-populated and Republican-leaning districts were under-populated. Raleigh Wake Citizens Ass’n, 166 F.Supp.3d at 609, 2016 WL 1060378, at *35. According to the district court, ”[t]his evidence belies a systematic under-population of districts to harm incumbents ... who are registered Democrats who *348 support progressive' education policies." IR What the evidence actually belies is the tenuousness of the district court’s analysis — because both District 5 and District 6 exhibit only negligible deviations from ideal population — both less than 0.2%.

. The district court incorrectly suggested that “[i]n Vieth, the Supreme Court rejected as nonjusticiable a political gerrymandering claim." Raleigh Wake Citizens Ass'n, 166 F.Supp.3d at 601 n. 11, 2016 WL 1060378, at '“19, n. 11. On the contrary, as we noted in Wright, "a majority of the (Vieth) Supreme Court refused to deem political gerrymandering claims to be per se nonjusticiable. And the Court has since recognized as much.” 787 F.3d at 269 (citing League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 414, 126 S.Ct. 2594, 165 L.Ed.2d 609 (2006) ("A plurality of the Court in Vieth would have held [political gerrymandering] challenges to be nonjusticiable political questions, but a majority declined to do so.")).

. Stated different, "barely two months [after Vieth], three of those Justices were part of an eight-Justice majority that affirmed the judgment in Larios, a case in which the lower court struck down a plan [with] relatively minuscule population deviations ... because they reflected ‘blatantly partisan and discriminatory’ attempts to protect Democratic incumbents while undermining Republican-held seats. As Sister Maria says in The Sound of Music, ‘When the Lord closes a door, somewhere He opens a window.’ ” Issacharoff & Karlan, 153 U. Pa. L. Rev. at 542.

. No party has made an argument regarding Voting Rights Act compliance, also recognized as a legitimate apportionment factor. We therefore do not address it.

. Even though the corresponding School Board district is identical, Plaintiffs in Wright made no such claim. We, like the district court, therefore do not address that issue.

. We see no reason why the November 2016 elections should proceed under the unconstitutional plans we strike down today.